## Gilbride v. Vikoren

116

C.P. of Bucks County, no. 93-5022.

*Arthur W. Hankin,* for plaintiffs.
*James I. Devine,* for defendant.

RUFE, J., *J.,* December 26, 1995—This opinion is written pursuant to an appeal by defendant, Farah H. Vikoren, M.D., from our order dated August 28, 1995, whereby we granted plaintiffs, Patricia and Eugene Gilbride, a new trial on the issue of whether Dr. Vikoren was negligent in the performance of Patricia Gilbride's laparoscopic surgery on November 23, 1992.

In November of 1992, Dr. Vikoren diagnosed Patricia Gilbride with a right ovarian cyst which required surgical removal. The laparoscopic surgery was performed by Dr. Vikoren as an outpatient procedure at Doylestown Hospital on November 23, 1992. Mrs. Gilbride was sent home that same evening.

Over the course of the next several days, Patricia Gilbride experienced abdominal pain, vomiting and a fever. The symptoms increased and by Friday, November 27, 1992, Mrs. Gilbride was admitted to the emergency room at Doylestown Hospital. Plaintiff was evaluated by Dr. Joseph Curci, a general surgeon who diagnosed a colon perforation and performed a reversible colostomy.

Subsequent to these procedures, Mrs. Gilbride was hospitalized on December 10, 1992 for treatment on a pulmonary embolism related to the November 27,

1992 surgery, and again in January of 1993, Mrs. Gilbride returned to Doylestown Hospital for reversal of the colostomy.

Plaintiff instituted the present action seeking damages for injuries sustained as a result of the negligence of Dr. Vikoren in performing the laparoscopic surgery and for Dr. Vikoren's negligence in failing to diagnose the perforation during the postoperative period. Eugene Gilbride, Patricia's husband, brought a claim for loss of consortium. A jury trial was held before the undersigned from April 24 through April 27, 1995 resulting in a verdict for defendant, Dr. Vikoren. Timely post-trial motions were filed by plaintiffs seeking a judgment notwithstanding the verdict or, alternatively, a new trial. Upon consideration of plaintiffs' motion, defendant's response thereto and upon review of the evidence of record, we concluded that the verdict was contrary to the weight of the evidence and so shocking to this court's sense of justice as to require a new trial. It is from this order that defendant timely appeals.

Initially, we note that the decision to grant or deny a new trial rests in the sound discretion of the trial court. *Thompson v. City of Philadelphia,* 507 Pa. 592, 493 A.2d 669 (1985). Moreover, a new trial based on weight of the evidence grounds should only be granted where a review of the evidence of record indicates that the "verdict is so inherently improbable, or at variance with admitted or proven facts or with ordinary experience as to render the verdict shocking to the court's sense of justice." *Houseknecht v. Walters,* 404 Pa. Super. 85, 90, 590 A.2d 20, 23 (1991). The appropriate standard for reviewing a trial court's decision to grant a new trial was recently rearticulated by the Pennsylvania Supreme Court in *Coker v. S.M. Flickinger Company Inc.,* 533 Pa. 441, 625 A.2d 1181 (1993)

and acknowledged by the Pennsylvania Superior Court in *Picca v. Kriner,* 435 Pa. Super. 297, 645 A.2d 868 (1994). The *Picca* court stated:

"Our scope of review is limited to those reasons upon which the trial court relied. We consider whether any of the trial court's reasons for granting a new trial have merit; if so, we defer to the trial court's decision. Because the trial court is uniquely qualified to evaluate factual matters, we will not disturb its decision absent an abuse of discretion or error of law." *Id.* at 299, 645 A.2d at 869.

The trial court has acted within its scope if the record adequately supports the decision. *Thompson, supra.* After an exhaustive review of the evidence of record, we concluded that the verdict rendered by the jury was inherently inconsistent with the evidence adduced at trial concerning the alleged negligence of Dr. Vikoren during the surgery, and was at variance with the uncontroverted facts concerning the perforation of the sigmoid colon.

The procedure performed by Dr. Vikoren was a laparoscopy and removal of the right ovarian cyst and a check of the left ovary. The first step in this procedure is to insert a Verres needle into an area created by a small umbilical incision. Small drops of saline solution are added to the needle to check the location of the needle. If the liquid is not able to be drawn back into the needle, the doctor will know that the needle was properly in the abdominal cavity and not in any organ. Next, carbon dioxide is put into the abdomen forcing it to expand. Once the area is inflated, the umbilical incision is made larger and the first trocar is inserted. This is a blind insertion.

When the trocar springs or pops through the wall of the abdominal cavity it is removed, leaving behind

a sheath tube. The laparoscope is inserted through the sheath tube. The scope has a camera attached to the head which enables the doctor to view the inside of the abdomen on a view screen. After the camera is in place, it is common to place one or two additional trocars into the abdomen. These are visual insertions because the doctor can watch the insertion upon the monitor. The additional probes are used to insert instruments and remove the cyst.

Plaintiffs' allegation was that the perforation in the sigmoid colon occurred during the insertion of the secondary left trocar. Since this is considered a visual insertion, the perforation would be the result of some negligence on the part of Dr. Vikoren. In contrast, defendant contended that the perforation occurred during the umbilical insertion, the blind insertion, because the sigmoid colon was out of its normal anatomical position due to adhesions in the abdominal cavity.

In support of their claim, plaintiffs offered the testimony of Dr. Joseph Curci, the general surgeon who located the perforation in the colon and performed the emergency colostomy. Dr. Curci was the only witness who actually saw Mrs. Gilbride's sigmoid colon and the only witness who actually saw, firsthand, the location of the perforation. Dr. Curci testified that the distance between the left trocar insertion site and the perforation in the colon was approximately one to one and a half inches. In fact, because the left trocar site was almost directly on top of the perforation, the doctor simply enlarged the trocar site and used it for the colostomy. He further stated that the distance between the umbilical insertion site and the perforation in the colon was approximately six inches. Based upon his observations of the close proximity of the perforation to the left secondary trocar

insertion site and since he could find no other source of the colon perforation other than the left trocar, it was the doctor's opinion that the perforation was caused by the secondary left trocar insertion.

When questioned concerning the location of the sigmoid colon, Dr. Curci stated that he found the sigmoid colon in its normal anatomical position and attached by its normal anatomical structures. He was absolutely positive that the position in which he found the colon was the same position it was in at the time of Dr. Vikoren's surgical procedure five days prior. In fact, the doctor had to cut away the sigmoid colon from its normal attachments in order to mobilize it for the colostomy. Dr. Curci remarked that if in fact Dr. Vikoren was required to move the colon or if she had been forced to cut adhesions or pull apart adhesions, he would have been able to detect those procedures, given that the laparoscopic surgery was only five days prior and scar tissue always bleeds when cut or torn. There was absolutely no evidence of any cutting, tearing or rearranging of the colon by Dr. Vikoren. Dr. Curci stated that it was not possible for the sigmoid colon, in this case, to have been pulled taut, up or away from its normal anatomic location at the time of Dr. Vikoren's surgical procedure. Finally, Dr. Curci testified that he did not observe any adhesions or scar tissue in the area of the sigmoid colon.

It should be noted that fact testimony may include opinions or inferences so long as those opinions are rationally based on the witness's perceptions and are helpful to a clear understanding of his or her testimony. *Havasy v. Resnick,* 415 Pa. Super. 480, 609 A.2d 1326 (1992). Likewise, a statement of opinion is admissible if the witness has had an opportunity for personal ob-

servation and obtained some impression from that observation. *Id.* In this case, Dr. Curci was the only one to actually see Mrs. Gilbride's sigmoid colon and it was his opinion, based upon his observations only five days after the initial surgery, that the secondary left trocar caused the perforation. The only other person who could have testified as to what the sigmoid colon actually looked like was Dr. Vikoren, and she admitted that she never saw the sigmoid colon during the procedure.

Plaintiff also proffered the expert testimony of Dr. Cynthia Cooke. Dr. Cooke is board certified in obstetrics and gynecology and has performed many laparoscopic procedures. Dr. Cooke testified that, to a reasonable degree of medical certainty, it was the secondary trocar that perforated the sigmoid colon. Further, it was her expert opinion that if an injury occurs during a secondary trocar insertion done under visualization, it is considered negligence. The doctor stated, based on her review of the medical records and reports, that there was no possibility that the first umbilical trocar could have reached so far down in the abdomen as to reach the sigmoid colon. Likewise, there was no evidence in the record to refute the conclusion that the colon was anywhere but in its normal position. Dr. Curci's testimony was the only evidence as to the location of the sigmoid colon and he stated that it was in its normal position. Likewise, Dr. Cooke pointed out that Dr. Vikoren's operative notes did not contain any reference to finding the colon out of its normal position.

Dr. Cooke admitted that Dr. Vikoren listed in her operative notes that there were adhesions present in the abdominal cavity. She admitted further, that when there are adhesions as a result of prior surgeries present

in the abdominal cavity and when those adhesions involve the intestines, sometimes those adhesions can move the sigmoid colon. Defendant argues repeatedly that this statement conflicted with the testimony of Dr. Curci. A close reading indicates that it does not. Although Dr. Cooke admits that adhesions can move the sigmoid colon in some cases, she specifically states, in her opinion, that result did not occur in this case. Dr. Curci testified that there were no adhesions in the area of the perforation at the time he saw it, nor was there evidence that adhesions had been present in the area of the sigmoid colon just five days prior. Dr. Cooke was unable to locate one piece of evidence in any of the medical records or operative reports associated with this case, which would have indicated that the colon was out of its natural position. Defendant posed a very general, non-fact specific question concerning the effect of adhesions in the abdominal cavity; then attempted to apply the answer to the very particular facts of this case. Dr. Cooke's ultimate conclusion was that based upon Dr. Curci's findings and Dr. Vikoren's operative note and deposition testimony, there was no other possible conclusion than that the colon was in its natural position at the time of the laparoscopic procedure.

Dr. Cooke acknowledged that there are accepted risks involved in a laparoscopic procedure which do not amount to negligence; however, she believed that the injury which occurred in this particular case suggested negligence. The insertion of the Verres needle and the insertion of the umbilical trocar are blind insertions and therefore, there are risks which are accepted because of that blind procedure. However, Dr. Cooke testified that the Verres needle should go no more than two to four inches into the abdominal cavity. Dr. Curci tes-

tified that the distance between the umbilical trocar site and the perforation was at least ·six inches. Dr. Vikoren admitted that the location of the perforation was below the left secondary trocar insertion site. Consequently, Dr. Cooke opined that the Verres needle could not have reached far enough to puncture the sigmoid colon. Since the secondary trocars are performed under visualization, Dr. Cooke stated that a perforation during a secondary trocar insertion is not an accepted risk of laparoscopic surgery and constitutes negligence.

In response to the testimony offered by plaintiffs, defendant offered her own testimony and the expert testimony of Dr. Martin Weisberg.

Dr. Farah Vikoren is a licensed physician in the Commonwealth of Pennsylvania and is board certified in the fields of obstetrics and gynecology. Dr. Vikoren testified as to the manner in which she conducted the laparoscopic procedure on Mrs. Gilbride on November 23, 1992. She admits that there was no problem with the insertion of the Verres needle into the umbilicus incision and there was no indication that it had struck an organ. Dr. Vikoren admitted that the first needle was not in the intestine or colon. Once the scope was in place, the doctor noted the presence of adhesions connecting the omentum with part of the intestine. She stated that she had to pass the scope between the intestines and the omentum to obtain a clear view of the cavity. Dr. Vikoren never noted in her operative report or in her testimony that she had to cut away adhesions or that she had to move the sigmoid colon in order to see the abdominal cavity. Rather, she testified that she never saw the sigmoid colon at any time during the procedure.

The doctor acknowledged that the secondary trocars were inserted under visualization. However, she stated that there was no evidence of a perforation during the procedure. She followed every guideline and inspected the pelvis area before ending the procedure and there was absolutely no indication of a perforation. When asked her opinion as to what caused the perforation, Dr. Vikoren stated that she did not know what happened and could think of no other possible cause for the perforation other than the adhesions blocking the Verres needle.

However, Dr. Vikoren admitted to several facts which contradicted that assumption. First, she admitted that the site of the perforation was actually below the site of the secondary trocar. This would make the distance between the perforation and the umbilicus trocar farther than the distance between the secondary trocar and the umbilicus trocar. Secondly, Dr. Vikoren admitted that the placement of the umbilical trocar would not have been in an area of the intestine where the perforation was found. Finally, nowhere in her operative notes does Dr. Vikoren state that she was required to cut or remove the adhesions she found in the cavity, nor did she report that the adhesions had in any way altered the location of the sigmoid colon. Consequently, one of the more significant aspects to Dr. Vikoren's testimony was that she had no idea how the perforation actually occurred. Thus, any opinion rendered as part of her testimony was mere speculation.

Additionally, Dr. Michael Weisberg testified on behalf of the defendant as an expert in the field of gynecologic surgery. Dr. Weisberg is a licensed physician in the Commonwealth of Pennsylvania and has performed many laparoscopic procedures.

Dr. Weisberg stated that he had no idea how the injury occurred and that, in his opinion, it could have happened from any of the instruments that were placed in the abdomen at the time of the surgery since they all could have reached the area where the perforation was located. Moreover, Dr. Weisberg did not believe that an injury which occurred during the insertion of a secondary trocar could only occur as a result of negligence. It was the doctor's "best guess" that the umbilical insertion caused the perforation, making it an acceptable risk associated with the procedure.

The doctor agreed that the left secondary trocar insertion could have been at least six inches away from the umbilical insertion. Moreover, he also concluded that since the colon is movable, scar tissue can take the colon and pull it up closer to the umbilicus. When questioned concerning this conclusion, the doctor admitted that there was no evidence to support his conclusion. Dr. Weisberg stated that, in his opinion, the only person who could have known the position of the colon was Dr. Vikoren. He discounted Dr. Curci's testimony because, in his opinion, the abdominal cavity could have looked entirely different when Dr. Curci saw it than five days earlier when Dr. Vikoren saw it. He testified that adhesions could have been pulled off, peeled off or cut off. He testified that the adhesions found in Mrs. Gilbride's abdomen had to be pushed or cut out of the way by Dr. Vikoren in order for her to have been able to visualize the pelvis. It was Dr. Weisberg's assessment that the perforation could have occurred during one of those maneuvers as well.

After an extensive review of Dr. Weisberg's testimony, it was clear to this court that his conclusion and opinions were implausible based upon the testimony of the other

witnesses. First, Dr. Weisberg testified that the umbilical insertion most likely caused the perforation. Such an opinion is not supported by the testimonies of Dr. Curci, Dr. Cooke, or Dr. Vikoren, who herself admitted that the placement of the umbilical trocar would not have been in the area where the perforation of the sigmoid colon occurred. Secondly, Dr. Weisberg concluded that the colon was moved out of its normal position by the adhesions and scar tissue present in plaintiff's abdomen. However, the *fact* testimony of Dr. Curci directly contradicts such a finding. Dr. Curci stated that had the colon been moved during the procedure performed by Dr. Vikoren there would have been evidence to that effect present in the abdomen, a mere five days after the surgery. Dr. Curci would have been able to detect changes to the scar tissue, the adhesions or the colon when he performed the exploratory surgery. Third, Dr. Weisberg stated that since Dr. Vikoren had to push and cut the adhesions from the colon and move the colon out of the way in order to get a clear view of the pelvic cavity, the perforation could have occurred at that time. Again, this is directly contradicted by the other witnesses. Dr. Vikoren's operative notes are silent as to any cutting of adhesions or moving of the colon. Rather, she testified that she never saw the sigmoid colon during the procedure. Likewise, Dr. Curci found the colon in its normal anatomic condition attached by its normal anatomic structures. There is nothing in the record to support Dr. Weisberg's conclusion.

It is a basic tenet of expert testimony that while an expert witness may base an opinion on facts of which he has no personal knowledge, those facts upon which the opinion is based must be supported by evidence in the record. *Yantos v. Workmen's Compensation Appeal Board,* 128 Pa. Commw. 231, 563 A.2d 232

(1989). An expert is subject to the usual rules of evidence and cannot base his opinion on extraneous, irrelevant factors not warranted in the record regardless of his skill and experience. *Kozak v. Struth,* 515 Pa. 554, 531 A.2d 420 (1987). Moreover, the opinions and conclusions of a person who has actually made a physical observation of the situation are entitled to greater weight than the opinion of one who draws solely upon a review of medical records. See *Burns v. Kabboul,* 407 Pa. Super. 289, 595 A.2d 1153 (1991). While an expert's opinion need not be based on an absolute certainty, an opinion based upon mere possibilities is not competent evidence.

Based upon all of the evidence accumulated in this case, we conclude that the jury either completely ignored the testimony of Dr. Curci or did not afford it the weight it warranted. The evidence presented in Dr. Curci's testimony was particularly compelling given his ability to physically observe the perforation and its proximity to the left secondary trocar insertion. In bold contrast, Dr. Weisberg's opinions were based upon sparsely random pieces of the record and completely ignored the physical evidence established by Dr. Curci. Likewise, Dr. Vikoren's opinions were completely speculative in light of her admission that she had no idea how the perforation occurred. Consequently, a verdict in favor of the defendant was at such variance with the physical evidence and proven facts presented at trial, that it was shocking to this court's sense of justice.

Defendant maintains that we erred in granting a new trial because we based our ruling on inconsistencies in the testimony and, in some respects, credibility determinations which are controlled by the jury. While it is true that credibility of witnesses is primarily the responsibility of the fact-finder, to disallow a court the

opportunity to grant a new trial on inconsistencies in evidence and credibility of witnesses is "tantamount to a suggestion that a trial court can never grant relief on a weight of the evidence claim." *Houseknecht, supra* at 92, 590 A.2d at 24. Here, after listening to the evidence during the course of the trial and after reviewing the evidence again in considering plaintiffs' post-trial motions, we were firmly convinced that a miscarriage of justice had taken place. As noted by the court in *Houseknecht,* "[t]he reason for granting a new trial when the verdict is contrary to the weight of the evidence is to give right another opportunity to prevail. *Thompson v. City of Philadelphia, supra." Houseknecht, supra* at 90, 590 A.2d at 23. Therefore, on the issue of whether Dr. Vikoren negligently perforated Patricia Gilbride's colon during the laparoscopic procedure of November 23, 1992, we found the verdict to have been against the weight of the evidence and granted plaintiffs a new trial.

Procedurally, defendant maintains that plaintiffs were duty bound to raise an objection that the verdict was against the weight of the evidence while the jury was still impaneled, and the failure to do so constituted a waiver of the claim for a new trial. Defendant cites the case of *Picca v. Kriner, supra* in support of her argument. In *Picca,* the Superior Court determined that problems with the jury verdict sheet resulted in an inconsistent verdict. Since the trial judge would have been able to resolve the problem by rewording the question on the verdict slip and then sending the jury back out to deliberate, the plaintiff should have objected to the inconsistent verdict before the judge dismissed the jury. The court went on to state that: "parties must not wait for post-trial motions to argue that the jury verdict is too flawed to sustain a judgment. Such arguments must be made before the court discharges the

jury. 'It is this failure to act before the jury was discharged that constitutes waiver. . . . The purpose of requiring action is to enable the jury to correct an obvious mistake.' " *Picca, supra* at 303, 645 A.2d at 871. (citations omitted)

Defendant would have this court apply the waiver rule to the case at bar.

However, we do not believe that this is the type of case to which the waiver rule was meant to apply. The jury's verdict in this case was not the result of an obvious technical problem or defect. Furthermore, sending the jury back to deliberate because the plaintiff believed the verdict was against the weight of the evidence was not a plausible option. In the very recent case of *Henery v. Shadle,* 443 Pa. Super. 331, 661 A.2d 439 (1995), the Superior Court distinguished the *Picca* case stating,

"In the present case, however, there were no specific interrogatories for the jury to answer in rendering its verdict, and the trial court gave a clear, concise jury charge outlining the applicable law of the case. . . . It would, therefore, have been specious for appellants to have pointed out any inconsistency, irrationality or problem with the verdict. . . . Thus, it seems that application of the *Picca* waiver rule is more prudently restricted to verdicts of obvious inconsistency and clear, certain irrationality." *Henery, supra* at 336, 661 A.2d at 442. (citation omitted) (footnote omitted)

The same rationale can be applied to the present case. Therefore, we determined that plaintiffs did not waive their right to request a new trial by means of a post-trial motion.